IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>COLENE HAGEMAN and BRENDA SEYBELS,<br><br>　　　　　Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:11-CR-208-TC |

　　　　Colene Hageman and Brenda Seybels have been charged with knowingly and intentionally possessing, with intent to distribute, methamphetamine. They move to suppress evidence obtained by the Government in the March 8, 2011, traffic stop and search of the Chevrolet Impala in which the Defendants were traveling.

　　　　Ms. Hageman and Ms. Seybels assert that the Government violated their Fourth Amendment rights to be free of unlawful detention and unreasonable searches. Specifically, they contend that (1) Sergeant Salas illegally detained them because the detention was unnecessarily prolonged without reasonable articulable suspicion of criminal activity; and (2) Sergeant Salas did not have reasonable articulable suspicion to have his dog, Duke, do a second drug sniff. Ms. Hageman and Ms. Seybels also contend that Miranda warnings were required.

　　　　Because the court finds that the continued detention and drug sniff were based on reasonable articulable suspicion and Miranda warnings were not required, the court DENIES the

motion to suppress.

## FINDINGS OF FACT[1]

On March 8, 2011, Sergeant Steve Salas of the Utah Highway Patrol (UHP) was on duty in his patrol car on Interstate 70, a known corridor for smuggling illegal drugs across the country. Sergeant Salas is, and was at all relevant times, assigned to UHP's Criminal Interdiction Team, which primarily focuses on apprehending drug smugglers through a high volume of traffic stops on known drug "pipelines."[2] He has received over 200 hours of specialized training over the years concerning interdiction of the illegal transport of contraband, primarily illegal drugs. For instance, he was trained to recognize "indicators"[3] of criminal activity, drug transporting tactics and hidden compartments in vehicles where illegal drugs can be stashed.

Sergeant Salas is certified as a dog handler by Utah's Police Officers Standards and Training (POST). Sergeant Salas is assigned a Belgian Malinois named Duke, who is four years old. Duke has served with UHP since March of 2010 and is POST certified as a narcotics detection dog and patrol apprehension dog. As a narcotics detection dog, Duke has been trained to detect the odors of marijuana, cocaine, heroin and methamphetamine. Sergeant Salas conducts weekly training with Duke, consisting of four hours per week in narcotics detection and four

---

[1] Unless otherwise noted, the facts are taken from the testimony and evidence admitted during the May 18, 2011, evidentiary hearing. All times are taken from the court's review of the video from Sergeant Salas's patrol car (Gov't Ex. 1) and are approximate.

[2] According to Sergeant Salas, a "pipeline" is the route or way in which a large quantity of narcotics is transported from one city to another, such as a highway. (Tr. at 6.)

[3] According to Sergeant Salas, an "indicator" is "a commonality which is often observed or found during a criminal incident, drug and traffic stop, based on the totality of the circumstances surrounding the traffic stop." (Tr. at 7.)

hours each week of patrol apprehension.

While on duty on March 8, 2011, Sergeant Salas was parked in the median of Interstate 70 in Emery County, running radar on eastbound traffic. Sergeant Salas saw a white Chevrolet Impala traveling east, toward him, that appeared to be speeding. Sergeant Salas activated his radar equipment, which showed that the car was traveling seventy miles per hour (the speed limit was sixty miles per hour). As the car approached and passed Sergeant Salas, he noticed that the driver-side front window was tinted and believed that it was darker than allowed under Utah law.

Sergeant Salas pulled out of the median, turned on his emergency lights and pulled the Impala over. Turning on the patrol car's emergency lights activated video equipment that recorded the stop, detention, questioning, search, and arrest. (See Gov't Ex. 1.) At 1:27 p.m., Sergeant Salas walked to the passenger side of the Impala and greeted the two women in the car. He then asked the driver, Ms. Hageman, for her driver's license. Ms. Hageman handed Sergeant Salas a Colorado driver's license in the name of Colene Hageman.

Sergeant Salas asked the two where they were coming from, and Ms. Hageman responded that they had been to California to visit the passenger's family. Sergeant Salas then asked for the vehicle registration and proof of insurance. The passenger, Ms. Seybels, responded that she had recently purchased the car and only had a title and insurance card, which she handed to him. Sergeant Salas asked Ms. Seybels for identification, and she gave him a California driver's license in the name of Brenda Seybels. Ms. Seybels told Sergeant Salas that she did not have a registration card because she had not yet registered the car. Ms. Seybels explained that she had just purchased the car the previous Friday and had not had time to register it because she wanted to go to California to see her father.

Sergeant Salas looked at the title and insurance card that Ms. Seybels had given him. The insurance card was for a 2007 Chevrolet Impala and was in the name of Brenda Seybels. The title,[4] which was from Colorado, was also for a 2007 Chevrolet Impala, but the owner was listed as Crystal Gallegos. The back of the title was signed by Crystal Gallegos but the purchase information had not been completed: personal information about Ms. Seybels and the purchase price were not filled in. Sergeant Salas asked if Ms. Seybels had a bill of sale, and she answered that she did not. Ms. Seybels was also unable to provide any information about the title owner, Crystal Gallegos.

Sergeant Salas told Ms. Hageman and Ms. Seybels that he had stopped them for speeding and for the window tint violation. He asked Ms. Seybels if she would be willing to go back to the patrol car with him. Ms. Seybels agreed. Sergeant Salas asked Ms. Seybels to go back to the patrol car with him for two reasons: first, as the owner of the car, the window tint violation was Ms. Seybels's responsibility; second, Sergeant Salas was suspicious about the title and lack of registration.

When they got into the patrol car, at 1:30 p.m., Sergeant Salas began looking through the insurance information and examining the title. As he did so, Sergeant Salas talked with Ms. Seybels about her trip. He asked who Ms. Seybels was traveling with, and Ms. Seybels said that it was her friend Colene. Sergeant Salas asked if Ms. Seybels knew Colene's last name, but she didn't. Ms. Seybels said that she had known Colene for approximately six months after having

---

[4]The title indicated that it should be kept in a safe place. (Gov't Ex. 2 at 1.) Sergeant Salas testified that having a title in a vehicle would not be a safe location. In his training and experience, drivers rarely carry titles with them. (Tr. at 82.)

4

been introduced by a neighbor.

Ms. Seybels began talking about the Impala, telling Sergeant Salas that she had just purchased it the previous Friday with money from her income tax return. Sergeant Salas asked if she was employed, and she said that she currently was not. Ms. Seybels told Sergeant Salas that she had worked at a gas station but had quit to take care of an ex-boyfriend. Sergeant Salas asked when Ms. Seybels had left for California, and she said that she had left on Saturday. The discussion lasted approximately three minutes from the time Sergeant Salas and Ms. Seybels got into the patrol car.

At 1:33 p.m., Deputy Gardner with the Emery County Sheriff's Office arrived on the scene, accompanied by a police dog. Sergeant Salas asked Deputy Gardner to have his dog sniff around the outside of the car. Ms. Seybels told Sergeant Salas that she didn't object to the dog's inspection around the car.

Sergeant Salas began to draft a warning to Ms. Seybels for the window tint violation. He continued to talk with Ms. Seybels as the dog sniffed the car. While the police dog checked the car, a Chihuahua that was in the Impala jumped out the window and ran toward Deputy Gardner and his dog. Deputy Gardner stopped his dog's inspection. The dog had not alerted to any drug presence in the car. Sergeant Salas testified that based on his experience as a handler and seeing Deputy Gardner's dog, he "could clearly see that the dog was distracted" as a result of the Chihuahua's interruption. (Tr. at 22.)

As Sergeant Salas worked on the warning for Ms. Seybels, he asked her about her travel plans. Ms. Seybels said that she left Colorado on Saturday, arrived in California on Sunday, spent Monday with her father and then left on Tuesday. Ms. Seybels also said that she and Ms.

5

Hageman had stopped in Las Vegas and Mesquite, but that they had not spent the night. Ms. Seybels explained that she had wanted to see her father because it was his birthday. Sergeant Salas asked when was her father's birthday, and she said that it was the following week. Sergeant Salas testified that he found this response unusual because Ms. Seybels had given him reason to believe that she was in a hurry to get to California but there wasn't any special event taking place while she was actually there. This led Sergeant Salas to ask why Ms. Seybels hadn't waited to go for the actual birthday, to which Ms. Seybels "really didn't have an answer." (Tr. at 24.) Ms. Seybels also told Sergeant Salas that she and Ms. Hageman had stayed with her father while in California.

At 1:36 p.m., Sergeant Salas contacted his dispatcher and asked her to run a check on the car. As he was waiting for a response, Sergeant Salas asked Ms. Seybels whether she had ever been arrested (she said that she hadn't) and verified the information on her driver's license. Approximately one minute later, the dispatcher confirmed that the car was not listed as stolen and that the car was registered to Crystal Gallegos, as listed on the title.

Sergeant Salas then asked Ms. Seybels more questions about the car. Ms. Seybels told Sergeant Salas that she had paid approximately $4000 for the car and had used most of her $5000 income tax return to do so. Sergeant Salas found this suspicious for two reasons: first, he believed that the car, "a 2007 Chevy, and it was only four years old, in decent condition," would be worth "at least double" the $4000; and second, he "thought it was suspicious that she would spend her entire income tax return on this vehicle when she didn't have an employment." (Tr. at 25-26.)

Sergeant Salas questioned Ms. Seybels about her relationship with Ms. Hageman. Ms.

Seybels told Sergeant Salas that she and Ms. Hageman were friends and had known each other for six months. Ms. Seybels said that a neighbor of hers, Bonnie Rodriguez, had introduced them. Ms. Seybels said that she didn't believe Ms. Hageman had a job but that she did believe Ms. Hageman had a van. At this point, Sergeant Salas had completed the warning. It was 1:40 p.m., approximately fifteen minutes after Sergeant Salas had pulled the car over and ten minutes after Sergeant Salas and Ms. Seybels went to his patrol car.

Sergeant Salas informed Ms. Seybels that he was going to give Ms. Hageman a warning for speeding and that the car did not show up as stolen. He then continued to question her about her living situation. Ms. Seybels told Sergeant Salas that she was living in an apartment, paying $525 per month in rent. When asked how she was paying rent in light of the fact that she was unemployed, Ms. Seybels responded that she was receiving unemployment and HUD assistance.

At 1:42 p.m., Sergeant Salas attempted to print the warning but the printer wasn't working. After approximately three minutes, during which no further conversation took place, Sergeant Salas returned Ms. Seybels's driver's license, title and insurance and gave her the printed warning. Sergeant Salas asked Ms. Seybels if it would be alright if he spoke with Ms. Hageman and if she stayed in the patrol car. Ms. Seybels agreed. Because Sergeant Salas did not believe that Ms. Seybels had purchased the car, he asked her if anyone had purchased it for her. Ms. Seybels responded "no" in a "very, very low" voice. (Tr. at 29.) Sergeant Salas then asked if anyone had helped her purchase the car, to which Ms. Seybels again very quietly responded "no."

Sergeant Salas was suspicious that Ms. Seybels and Ms. Hageman were involved in some type of criminal activity. Sergeant Salas's suspicion was based on several factors:

7

> One is you had two adult females that are traveling in a vehicle from Colorado to California and back. They stated they were friends, yet they didn't know their last names. . . . [Ms. Seybels] stated she had known [Ms. Hageman] for six months, yet she didn't know her last name. Both females were unemployed, and it's just not consistent with innocent motorists to travel that distance when you don't have a job. The vehicle was a third-party vehicle. It was not registered to anyone inside of the vehicle.

(Tr. at 30.) Sergeant Salas also found their travel plans "very suspicious" because "it didn't make any sense to travel out when they did, or not stay for the birthday, if that's the reason they went out there to actually see the father because his birthday was coming up." (Tr. at 31-32.)

Sergeant Salas went to the parked Impala to speak with Ms. Hageman. He returned her driver's license and asked if he could ask her some questions. Ms. Hageman agreed. Sergeant Salas asked Ms. Hageman the name of her passenger, and she responded that it was her friend, Brenda. When asked if she knew Brenda's last name, Ms. Seybels said she knew it but could not pronounce it. Sergeant Salas asked if she could spell the name, and Ms. Hageman said that she could not. Ms. Hageman told Sergeant Salas that she had known Ms. Seybels for a year, which was inconsistent with the six-month time period that Ms. Seybels had given him. Sergeant Salas asked Ms. Hageman how she and Ms. Seybels met. Ms. Hageman said that a friend introduced them but that she could not remember the friend's name.

Sergeant Salas continued to question Ms. Hageman about their travel plans. Ms. Hageman told him that she and Ms. Seybels had gone to California to see Ms. Seybels's parents. Ms. Hageman said that while in California, they had visited Ms. Seybels's father, mother and sister. Ms. Hageman told Sergeant Salas that she and Ms. Seybels had stayed at Ms. Seybels's sister's house, which was inconsistent with Ms. Seybels's statement that they had stayed with her father. When asked why she had gone on the trip, Ms. Hageman replied that she had gone to help

8

drive. Ms. Hageman confirmed that she believed Ms. Seybels owned the Impala, but that she was not with Ms. Seybels when she purchased it.

Sergeant Salas asked Ms. Hageman if there was anything illegal in the car, and she said no. He repeated the question and asked specifically if there was any marijuana, cocaine, heroin, methamphetamine or large amounts of money in the car. Ms. Hageman answered "no." Sergeant Salas asked Ms. Hageman if he could search the car. Her answer was that the car did not belong to her. When asked if it would be alright to search her personal belongings in the trunk, Ms. Hageman said that she wanted to be on her way. Sergeant Salas said, "okay" and returned to his patrol car where he spoke again with Ms. Seybels. (Tr. at 35.) Approximately twenty-five minutes had passed since Sergeant Salas first stopped the Impala.

Once back at the patrol car, Sergeant Salas told Ms. Seybels that there were discrepancies in what he had been told by her and Ms. Hageman. Ms. Seybels confirmed that they had stayed with her father but said that Ms. Hageman might have said that they stayed with her sister because her sister and father lived together. It had not appeared to Sergeant Salas during his conversation with Ms. Hageman that Ms. Seybels's sister and father lived together.

At that point, Sergeant Salas asked Ms. Seybels if there was anything illegal in the car and she said that there wasn't. As he had done with Ms. Hageman, Sergeant Salas specifically asked about marijuana, cocaine, heroin and methamphetamine. Ms. Seybels said no to each. Sergeant Salas then asked, "Is it okay if I search your vehicle?" (Tr. at 37.) Ms. Seybels responded, "No, I'd rather you not." (Tr. at 37.) Sergeant Salas informed Ms. Seybels that he intended to have his own dog inspect the car, to which Ms. Seybels said, "all right." (Tr. at 37.)

At 1:54 p.m., Sergeant Salas, based on his belief that the earlier drug sniff was not

9

reliable had his dog, Duke, begin the sniff at the rear side of the car and work up the up the passenger side to the front of the car. During the sniff, Duke showed a strong alert to the odor of narcotics and then aggressively indicated, by scratching, to an odor between the taillight and the license plate. The sniff was completed at 1:56 p.m. and Duke was returned to the patrol car.

Sergeant Salas told Ms. Hageman and Ms. Seybels of Duke's indication and asked both women to stand on the side of the road. He then began to search the car with the help of Deputy Gardner. When Sergeant Salas began searching the passenger compartment, Ms. Seybels approached him and told him that although she had given him consent to search the trunk,[5] she had not given him consent to search the passenger compartment. Sergeant Salas told her that he was searching based on Duke's indication.

During the search of the passenger compartment, Sergeant Salas located a black purse under the driver's seat; the purse contained what appeared to be a small quantity of methamphetamine. At this point, Ms. Hageman and Ms. Seybels were taken into custody and then Sergeant Salas continued the search.[6]

Ms. Hageman and Ms. Seybels were detained for approximately thirty minutes before Sergeant Salas had Duke begin his drug sniff.

---

[5]Sergeant Salas testified that Ms. Seybels never gave him consent to search any part of the car.

[6]Ms. Hageman and Ms. Seybels do not challenge the subsequent search other than contending that any evidence obtained as a result of their detention and the second dog sniff should be excluded as fruit of the poisonous tree. Upon finding nothing further in the car, Sergeant Salas decided to have the car taken to a shop where it could be lifted. During the later search, Sergeant Salas pulled back the cushion of the arm rest and located a plastic package which appeared to be illegal narcotics. He located a hidden compartment that had been built into the transmission hump of the car. Inside, Sergeant Salas found seven one-pound packages of contraband, which later tested positive for methamphetamine.

## CONCLUSIONS OF LAW

Defendants challenge the detention and the drug sniff that led to the search of the car. Before reaching the merits, the court must resolve the threshold standing issue raised by the Government.

**<u>Standing</u>**

The Government contends that neither Ms. Hageman nor Ms. Seybels has standing to challenge the search of the Impala.[7]

To determine whether a party has standing, the court must consider "(1) whether the defendant has manifested a <u>subjective expectation</u> of privacy in the object of the challenged search, and (2) whether that expectation of privacy was <u>objectively reasonable</u>." <u>United States v. Gama-Bastidas</u>, 142 F.3d 1233, 1239 (10th Cir. 1998) (emphasis added). The defendant bears the burden of establishing standing. <u>United States v. Valdez Hocker</u>, 333 F.3d 1206, 1209 (10th Cir. 2003).

> To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or a lawful control over the car. Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself.

<u>Id.</u> (internal citations and quotations marks omitted).

The court finds that both Ms. Hageman and Ms. Seybels have established standing to

---

[7]The parties do not dispute that both of the Defendants have standing to challenge the traffic stop and her own detention. <u>See, e.g.</u>, <u>United States v. Erwin</u>, 875 F.2d 268, 270 (10th Cir. 1989) (holding that passenger has Fourth Amendment interest in seizure of his person—which includes a traffic stop—so passenger had standing to challenge stop and detention).

11

challenge the search. "Whether a driver's privacy interest in an automobile is reasonable depends on the driver's lawful possession of the vehicle." United States v. Soto, 988 F.2d 1548, 1552 (10th Cir. 1993). "Where the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest. Rather, at a minimum, the proponent bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession." Valdez Hocker, 333 F.3d at 1209 (internal citations and quotation marks omitted).

The Government contends that Ms. Hageman and Ms. Seybels, neither of whom testified during the evidentiary hearing, have not met their burden. But the fact that the two Defendants did not testify is not necessarily dispositive of the issue:

> The proponent of a motion to suppress bears the burden of demonstrating his standing to challenge the search. Although defendant did not testify at the suppression hearing, the record indicates that when questioned by Officer Barney, defendant asserted that the car was owned by his uncle, Mr. Corral, who had loaned him the car. The registration produced by defendant bore Corral's name, and a computer check on the vehicle revealed that it had not been reported stolen. Thus, . . . defendant here claimed to have borrowed the car from the rightful owner, and produced a registration bearing that individual's name. Although this evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car.

Soto, 988 F.2d at 1553.

Here, the court finds that uncontested evidence from the hearing is sufficient to establish standing for both women. First, Sergeant Salas testified that the Impala's title listed Crystal Gallegos as the owner of the Impala. Second, Sergeant Salas's testimony and the video of the stop contains uncontroverted statements that Ms. Seybels purchased the car from Crystal Gallegos and that Ms. Hageman was driving the car at the request of Ms. Seybels, who Ms.

12

Hageman believed owned the Impala.

This case is similar to Valdez Hocker, in which the court held that the driver had standing even though he borrowed the car from someone other than the registered owner, because the driver reasonably believed the lender had a familial relationship with the registered owner and had authority to lend him the car. 333 F.3d at 1209-10. The Valdez Hocker court noted that if the defendant had claimed he personally obtained possession from the owner, as Ms. Hageman did, "he would 'plainly ha[ve] a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.'" Id. at 1209 (quoting United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990)).

The court finds that Ms. Hageman and Ms. Seybels have established both the subjective and objective components necessary to confirm standing to challenge the search.[8]

**Traffic Stop[9] and Detention**

A routine traffic stop is a seizure within the meaning of the Fourth Amendment, so it is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999) (citing Delaware v. Prouse, 440 U.S. 648 (1979), and quoting Whren v. United States, 517 U.S. 806 (1996)). The court must consider the totality of the circumstances. E.g., United States v. Alcaraz-Arellano, 441 F.3d 1252, 1257-58 (10th Cir. 2006). Following the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968), the court must make a dual inquiry: (1) was the traffic stop justified at its inception, and

---

[8]Even if neither of the Defendants has standing, the result is the same because the court, as discussed below, is not suppressing evidence obtained during the search.

[9]The Defendants do not challenge the validity of the initial traffic stop.

(2) was the detention "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997) (internal citations and quotation marks omitted).

Continued Detention

Because Ms. Hageman and Ms. Seybels do not dispute that the stop was justified at its inception, the court must determine whether "the investigative detention exceeded permissible Fourth Amendment bounds." Id. Given the totality of circumstances, the court finds that the detention did not violate the Defendants' Fourth Amendment rights.

"During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. The detaining officer may also question the vehicle's occupants regarding their identities, travel plans, and ownership of the vehicle." United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003) (internal citations omitted); see also Mendez, 118 F.3d at1429 (officer may check whether driver has outstanding warrants and whether the vehicle has been reported stolen).

After initially speaking with Ms. Hageman and Ms. Seybels, Sergeant Salas had a valid reason to detain the two women further so he could issue the warning citation. The court now considers Sergeant Salas's continued detention and questioning of Ms. Seybels and Ms. Hageman.

*Initial Questioning of Ms. Seybels*

Sergeant Salas's questioning of Ms. Seybels can be divided into four intervals: the initial questioning inside the patrol car; the time during which Sergeant Salas was writing the warning ticket; the time while Sergeant Salas was waiting for the dispatch operator to report the results of

the stolen vehicle check; and the time before Sergeant Salas returned Ms. Seybels's documents.

During the initial questioning, Sergeant Salas asked Ms. Seybels about her relationship with Ms. Hageman. Ms. Seybels began to talk about her purchase of the Impala, which led Sergeant Salas to ask some questions about Ms. Seybels employment. Such questioning was proper because an officer may routinely ask about ownership of the car during a traffic stop. Alcaraz-Arellano, 441 F.3d at 1259. Even if, and to the extent, Sergeant Salas's questions went beyond the permissible topic of vehicle ownership, they did not "appreciably lengthen the detention and therefore the Fourth Amendment requires no justification," id.; Sergeant Salas's questions lasted only three minutes.

During the second interval, Sergeant Salas asked Ms. Seybels information related to filling out the warning ticket. In addition, he asked her about her travel plans. Again, such questioning was proper because officers may routinely ask about travel plans during a traffic stop. Id.

Sergeant Salas' questioning during the third interval occurred while he was waiting for the response from the dispatch operator, from approximately 1:36 p.m. to 1:38 p.m. The stolen vehicle check itself was permissible and the questioning did not prolong the detention while the check was being performed. Id. (citing United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) ("[D]uring a routine traffic stop the officer may ask to see a driver's license and registration and check that they are valid.")). As a result, the questioning, regardless of the topic, did not violate the Fourth Amendment.

The final interval, the questioning after Sergeant Salas was notified that the car was

registered to Crystal Gallegos, must be analyzed differently because it did prolong the stop.[10] Sergeant Salas continued to ask Ms. Seybels questions for approximately four minutes before attempting to print the warning ticket. The additional questioning could be justified "if prolongation of the stop was supported by reasonable suspicion." Alcaraz-Arellano, 441 F.3d at 1260. Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996).

At this point in the detention, Sergeant Salas had developed reasonable articulable suspicion through numerous indicators which, in the aggregate, suggested that criminal activity was occurring.[11] Those indicators included the following: knowledge that Interstate 70 is a substantial drug transportation corridor; Ms. Seybels's lack of registration; the fact that the title did not contain any purchase information or any information about Ms. Seybels; Ms. Seybels kept the title in the car; Ms. Seybels did not have a bill of sale; Ms. Seybels's statement that she had purchased the car for $4000 with her $5000 income tax return when she was unemployed and the car appeared to be worth much more; their implausible travel itinerary; and the inconsistency between the rush to get to California and the fact that Ms. Seybels's father's birthday was not until the following week. These factors, taken together, were sufficient to give Sergeant Salas reasonable articulable suspicion of criminal activity. See Alcaraz-Arellano, 441

---

[10]It appears that Sergeant Salas might have been attempting to print the warning ticket during this period of questioning but was experiencing trouble with the printer. Although it is possible that the further questioning did not prolong the stop, the result is the same because the court finds that Sergeant Salas had the reasonable articulable suspicion necessary to prolong the stop.

[11]The court notes that deference is to be given "to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Mendez, 118 F.3d at 1431.

F.3d at 1260 ("We agree that it was implausible that an unemployed New Yorker would innocently drive to California from New York, visit there for less than two days, purchase a vehicle . . . , and then drive back. [The Deputy] thus had reasonable suspicion to detain [the defendant] for further investigation after returning his license and registration."); see also United States v. Santos, 403 F.3d 1120, 1129 (10th Cir. 2005) ("Implausible travel plans can contribute to reasonable suspicion."); United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (officer had reasonable suspicion to detain motorist in part because he "did not find it plausible that Defendant would drive from California to North Carolina merely to take a very dilapidated sofa to some friends."); United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483-84 (10th Cir. 1994) (overruled on other grounds) (holding that detention of defendant was supported by reasonable suspicion based on unsigned title and no registration, conflicting birth dates on documents provided, questionable explanation for long trip and lack of knowledge about construction company that allegedly provided the truck).

Ms. Seybels and Ms. Hageman contend that any suspicion Sergeant Salas had was resolved when the first drug sniff did not result in an alert to the odor of narcotics and when he was told by the dispatch operator that the car was registered to Crystal Gallegos. Neither of these events was determinative. First, Sergeant Salas testified that from his training and experience as a dog handler, he could tell that the first dog had been distracted by the Chihuahua. This led him to believe that the sniff was not reliable. Second, the response from dispatch did not indicate that Ms. Seybels owned the car, only that it was registered to Crystal Gallegos and not reported stolen. Sergeant Salas testified that, in his experience, people hauling contraband are usually hired to do so and are usually given a car that is not registered in their names. Considering these

17

two events and the other bases for Sergeant Salas' suspicion, the court finds that Sergeant Salas had a reasonable and articulable suspicion that Ms. Seybels and Ms. Hageman were engaged in criminal activity.

*Questioning of Ms. Hageman*

Sergeant Salas's reasonable articulable suspicion also justified his continuing the stop to question Ms. Hageman back at the Impala. Sergeant Salas's questioning of Ms. Seybels in the fourth interval, discussed above, did nothing to resolve his suspicion. Ms. Seybels provided further information about her financial situation that made it implausible that she purchased the car. She also provided further details about their travel plans that confirmed their implausibility. Accordingly, Sergeant Salas was justified in prolonging the detention to question Ms. Hageman.

*Resumed Questioning of Ms. Seybels*

Sergeant Salas's reasonable articulable suspicion continued to justify his further prolonging the detention to again question Ms. Seybels in the patrol car. Ms. Hageman's answers to his questions had done nothing to resolve his suspicion and had, in fact, heightened it. Ms. Hageman provided details about their travel plans that were inconsistent with what Ms. Seybels had told Sergeant Salas. This inconsistency, coupled with the other information that Sergeant Salas had, gave him the reasonable articulable suspicion necessary to return to the patrol car and continue to question Ms. Seybels.

<u>The Drug Sniff</u>

It is well established that "[a]n investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity." <u>United States v. Villa-Chaparro</u>, 115 F.3d 797, 801 (10th Cir. 1997)

(quotations omitted); see also Wallace, 429 F.3d at 976 (officer reasonably prolonged detention to wait for drug sniffing dog because he had reasonable articulable suspicion that the defendants were involved in criminal activity). In this case, the detention was not unreasonably extended.

As discussed above, Sergeant Salas had developed a reasonable articulable suspicion that Ms. Seybels and Ms. Hageman were engaged in criminal activity. Sergeant Salas was justified in expanding the scope of the detention and using his own dog, Duke. And, as discussed above, the fact that the first drug sniff had not resulted in an alert did not diminish Sergeant Salas's suspicion.

### *Miranda* **Warnings**

It is well established that Miranda "warnings are simply not implicated in the context of a valid Terry stop" unless the stop was effected using a level of force more associated with formal arrest than with the typically non-coercive and nonthreatening traffic stop. United States v. Perdue, 8 F.3d 1455, 1464 (10th Cir. 1993) (finding Miranda warnings required where the defendant was stopped in an isolated, rural area, and the officers forced the vehicle to stop with guns drawn, placed the defendant face down on the ground, and questioned him with guns pointed). Compare with United States v. Raynor, 108 Fed. App'x 609, 613 (10th Cir. 2004) (unpublished) (finding Miranda warnings not required where the officer "merely ordered [the defendant] out of the van and into the patrol vehicle. . . . Neither weapons nor handcuffs were used in effectuating the stop. Thus, the amount of force used in this case was that normally associated with a routine traffic stop.").

The facts of this case "stand[] in stark contrast" to those cases where the Tenth Circuit has held a traffic stop to require Miranda warnings. Raynor, 108 Fed. App'x at 613. Sergeant

Salas conducted a routine traffic stop and did not use any coercion in handling the stop; no handcuffs or weapons were used. Although the detention continued beyond the original purpose of the stop, which was justified by Sergeant Salas's reasonable articulable suspicion, there was no level of force employed by Sergeant Salas that could have given rise to the level of intrusion required for <u>Miranda</u> warnings. Accordingly, <u>Miranda</u> warnings were not required and the Defendants' statements are admissible.

## ORDER

For the foregoing reasons, the Defendants' Motion to Suppress (Docket No. 19) is DENIED.

DATED this 21st day of September, 2011.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge